HOLLIDAY v. SNOW.

1. MORTGAGES—DEBTS SECURED.

A note previously indorsed by H. for W. is within a mortgage to secure an existing indebtedness and "any and all accommodation indorsements made" by H. for W. up to the sum of $3,000, to which extent H. "agrees to indorse for W. * * * as from time to time required," the total of said indorsements in no event to exceed said sum of $3,000.

2. SAME—FORECLOSURE—RELEASE OF PERSONAL LIABILITY—SUBROGATION.

W., to secure his indebtedness to H., assigned to him contracts made by W. for the sale of land, gave him deeds of the land, and assigned to him certain mortgages. Then, as collateral security for the payment of such indebtedness out of said contracts and mortgages, W. gave H. a mortgage on other lands, which lands W. afterwards deeded to S., W. agreeing to pay and discharge the mortgage thereon. Thereafter H., with knowledge of the deed to S., took surrenders of all but one of the land contracts from the vendees, and foreclosed the other contract and the mortgages assigned him, bidding in the lands in his name, all under an arrangement with W. that he was not to take the property as against W., and that the amounts bid on the foreclosure should not bind him as the amounts to be credited on his claim. *Held*, that while such arrangement was good as against S., and while he could not insist that H. should exhaust all personal remedies before resorting to the lands deeded to S., he had a right, in a suit by H. to foreclose all the securities for his claim, to have the property other than that so deeded sold first, and to have credit to the extent to which he may have been prejudiced in his right to be subrogated to H.'s security by the release of responsible vendees or mortgagors from their personal liability. GRANT, J., dissenting from the last proposition; there being nothing to indicate bad faith on the part of H. or W.

3. SAME—APPEAL—REMANDING RECORD FOR EVIDENCE.

Where the amount chargeable against defendant's land depended on whether those primarily liable for the debt, who had been released by the creditor, were financially responsible, as to which there was no proof, the case was remanded therefor, notwithstanding the law presumes solvency. GRANT, J., dissenting.

Appeal from Wayne; Frazer, J.   Submitted November 14, 1901.   Decided March 4, 1902.

Bill by William P. Holliday against Mary A. Snow and others, impleaded with Robert J. Wilson and wife, to foreclose a mortgage.   From a decree for complainant, defendants appeal.   Case remanded for further evidence.

*Barbour & Rexford,* for complainant.

*Walker & Spalding,* for defendants.

HOOKER, C. J.   On March 1, 1894, Robert J. Wilson sold and assigned to the complainant nine contracts upon lands which he had sold to different persons, at the same time giving to the complainant warranty deeds of the premises covered by them.   He also sold and assigned two mortgages upon real estate, in Grand Rapids and Greenville respectively.   The aggregate amount due Wilson upon these was upwards of $17,000.   The Grand Rapids mortgage was subject to a prior mortgage.

On November 1, 1894, Wilson gave the complainant a mortgage upon real property in Detroit, called the "Coronado Flats."   It was expressed to be a collateral security for the payment to complainant, out of the contracts and mortgages aforesaid, of the sum of $16,675, with interest from March 1, 1894, and security also for "any and all accommodation indorsements made by him for said Wilson, up to the sum of $3,000; to the extent of which sum said Holliday [complainant] agrees to indorse for said Wilson negotiable bank paper in such sum or sums as from time to time required by said Wilson, but in no event shall the total of said indorsements exceed said sum of $3,000."

In February, 1895, Wilson sold and conveyed the Coronado property to Snow, agreeing with him that he would pay and discharge of record the Holliday mortgage thereon within six months.   The complainant learned of this sale soon after it occurred.   He afterwards obtained possession

of the premises covered by eight of the land contracts, through the surrender of the contracts by the respective vendees therein. The other contract, called the "Tomlinson Contract," and the two mortgages first mentioned, were foreclosed, and the premises were bid in by him, under an arrangement with Wilson whereby he was not to take such property as against Wilson, and the amount bid was not to bind complainant as the amount to be credited on his claim. He paid no money in the transaction upon his bids. It does not appear that Snow knew anything about the surrenders or foreclosures, or the bidding arrangement between complainant and Wilson, and it is claimed that there is no evidence as to whether or not the vendees in the land contracts were pecuniarily responsible.

Snow died in October, 1897, and this suit was brought to foreclose the interest of Wilson in all of the parcels, and the mortgage on the Coronado Flats. The widow and three minor children of Snow, and his executor, defend. Wilson allowed the bill to be taken as confessed. It prays for the sale of the several parcels in a specified order, the Coronado Flats being last. The circuit court made a decree in substantial conformity to the prayer of the bill, and the defendants, with the exception of the Wilsons, have appealed.

The claim of the complainant includes the sum of $1,500, which he asserts that he paid upon a note indorsed by him. The fact of payment does not seem to be denied, but defendants claim that this note is not within the provision of the mortgage upon the Coronado Flats. The clause of the mortgage applicable to this question is as follows:

"It is understood and agreed that this mortgage shall also stand as security to said William P. Holliday, party of the second part herein, for any and all accommodation indorsements made by him for said Robert J. Wilson, up to the sum of $3,000; to the extent of which sum said Holliday, in accepting this mortgage, agrees to indorse

for said Wilson negotiable bank paper in such sum or sums as from time to time required by said Wilson, but in no event shall the total of said indorsements exceed said sum of $3,000."

The mortgage was dated November 1, 1894. The note in question was dated March 1, 1894, which was the date of the assignment of the land contracts and mortgages to the complainant. The date of payment is in dispute. We are of the opinion that the learned circuit judge placed the correct construction on this provision, in view of the circumstances under which the mortgage was given. That construction does no violence to the language used, and we feel justified in inferring that the complainant was taking security for all his claims, and that the parties did not intend to make an exception of this note.

The effect of the warranty deeds and assignments of the land contracts was to create equitable mortgages on the interest of Wilson in the lands, subject to the equitable title in the vendees. The assignment of the mortgages amounted to a mortgage of the same, or, under our rule that a mortgage does not convey a title, at least a pledge of the mortgages. So far as the land itself was concerned in either case, there was a limitation on Holliday's claim, which, at most, covered the amount due Wilson upon the respective instruments; *i. e.*, the mortgages and contracts. If the amount due him was less than the value of the land, or if the mortgagors and vendees were irresponsible, Holliday would be benefited by the surrender of the contracts and the foreclosure of the mortgages. That seems to have been the view taken by Wilson and Holliday, the latter being willing to permit the foreclosures and surrenders to be made in his name (title being in him), with a view to putting the titles where Wilson could realize upon the lands and pay Holliday's claim. We think this should be looked upon, not as an attempt to foreclose his securities for the purpose of extinguishing his debt, but to foreclose and cut off the equities of the mortgagors and vendees for the benefit of Wilson, and the

increase of his own security. We think that there can be no doubt of Wilson's right to redeem these lands at any time, notwithstanding such proceedings, and the only important question in the case is whether the defendants may complain.

By his purchase of the Coronado Flats, it became important to Snow that Holliday should secure his pay from Wilson directly, or through the other securities, to the end that none of the burden should fall upon the Coronado Flats. We understand that his counsel do not contend that Holliday might not have foreclosed upon the Coronado Flats first, and it is clear that, upon payment of the debt, Snow might have been subrogated as to all of the securities; but it is contended that he did not do that,— i. e., foreclose upon the Coronado Flats first,—and, having attempted to foreclose the other mortgages, and taken a surrender of the land contracts, he must apply such securities to their full amount upon his debt, to the relief of the Coronado Flats, whatever his rights may be as against Wilson.

We think that the foreclosures and surrenders should not be construed as an attempt to collect Holliday's debt, and that defendants' claim in that particular is not well founded. If they have a right to any credit growing out of those transactions, it is because Holliday had some tangible security over and beyond the land covered by said contracts and mortgages. Their counsel claim that Holliday, as the pledgee of the mortgages and assignee of the contracts, had security to the extent of the personal liability of the several and respective mortgagors and vendees, and that they, the defendants, suffered injury through their release by the surrender of the contracts, and the failure to collect deficiencies arising upon the foreclosure of the mortgages.

The complainant's bill attempts to foreclose all of the securities for his claim. While we think that the defendants have a right to have other parcels sold before the Coronado Flats can be disposed of, we are not satisfied that

they have a right to insist that complainant shall exhaust his remedies for the collection of the debt, against not only the debtor himself, but against the several and respective mortgagors and vendees referred to, before he can sell the flats. We know of no authority for such a rule, and understand the general practice to be to sell the mortgaged premises in the proper order, leaving subsequent purchasers and incumbrancers to pay and reimburse themselves through subrogation if their property is threatened. This view does not justify the complainant in impairing his security to the injury of Snow's right of subrogation, and, if it is made to appear that he has actually done so, the defendants would be entitled to a corresponding credit.

We have seen that the complainant has foreclosed two mortgages and one land contract, and bid in the property practically for Wilson. So far as said lands are subject to sale upon this foreclosure, the defendants have not been deprived of a remedy against them by subrogation. It is obvious, however, that the amount of such bids may have lessened the extent of the mortgagors' personal liability, and if the lands were worth less than the amount bid, and will not produce such amount, the personal liability has been disproportionately reduced. That is very clearly shown in the case of the Grand Rapids mortgage, where the entire title was cut off by the subsequent foreclosure of a prior mortgage, and in the Greenville mortgage, where, by the mutual consent of Wilson and complainant, land bid in for $4,200 was sold by complainant for $2,300, making a net loss on that transaction of $1,900. The same question arises on the land contracts which were surrendered. By accepting these surrenders, the complainant has released the vendees from their personal liability upon their respective contracts. If such liability exceeded the value of the lands, there was, theoretically at least, a lessening of the security, to which the defendants might have claimed a right of subrogation. They should receive credit upon the amount that is chargeable against their land, if it appears that they have been injured.

We are of the opinion that the defendants cannot insist that the complainant's claim be reduced by the amount of the bids at foreclosure sales of the mortgages and land contract. Nor can they complain of a failure to collect, or attempt to collect, deficiencies arising upon such sales, for they may be subrogated to the complainant's rights by paying the debt, and may enforce collection by appropriate proceedings. Where, however, there has been a voluntary release whereby the security has been actually lessened, we think they are entitled to credit, if there be any such. This raises questions of fact; e. g., were any of these mortgagors or vendees financially responsible, so that their contracts could have been enforced? It is said that we have no proof on this subject, and each party insists that the burden of proof is upon the other. We understand that the law presumes solvency, not insolvency. Yet we fully appreciate the probabilities indicated by the action of Wilson and the complainant in attempting to cut off outstanding equities upon the property mortgaged and contracted. Few men release a personal liability if valuable. But this is not evidence to overcome the presumption of solvency. We have here a claim of $24,000, which we are asked to wipe out, so far as defendants' liability is concerned. How much may be realized from the other lands we cannot tell, but apparently a large sum is chargeable upon the Coronado Flats, unless the complainant has done an improbable thing, viz., surrendered valuable security. We are reluctant to permit this to be decided upon a bare presumption, when proof is probably attainable. Again, it is alleged in the bill that the course taken by complainant was with the consent of Snow.

We feel justified in remanding this record to the circuit court, with leave to the parties to take proofs upon these subjects, and direction to the circuit judge to hear, settle, and return the same, together with the cause, with his opinion thereon, with all consistent speed. The costs will abide the further order of the court. It is so ordered. [1]

[1] Subsequently, on stipulation of the parties, the decree below was affirmed, with costs to complainant.

MOORE and MONTGOMERY, JJ., concurred with HOOKER, C. J.

GRANT, J. ( *dissenting* ). I see no reason why this case should be remanded for further testimony. Even if it should have been found that some of the vendees in these land contracts were responsible, still, in the absence of bad faith or an attempt to defraud Mr. Wilson's grantee, Snow, I do not think the proceedings are open to this controversy on the part of Mr. Snow's heirs. The testimony establishes the fact that Mr. Wilson and Mr. Holliday considered it for the best interest of all concerned that these contracts be surrendered without further expense. Upon the neglect or refusal of the vendees to carry out their contracts, the vendor has three remedies: (1) Bills for specific performance; (2) suits at law to recover the purchase price; (3) repossession of the property and suits to recover damages for a breach of the contract. Mr. Wilson was personally responsible to Mr. Holliday. Mr. Snow was not. Mr. Snow had taken Mr. Wilson's personal obligation to pay the mortgage debt. It seems to me to have been clearly understood, under these circumstances, that Wilson and Holliday controlled the securities conveyed to Holliday by these mortgages and contracts, bound of course to exercise the utmost good faith to realize from them in reduction of the debt due from Wilson to Holliday. Mr. Wilson was of the opinion that it would be better for him and for all concerned to take back the land, and not to take proceedings against the vendees to enforce these contracts. He was the man most interested. Were he and Mr. Holliday under obligations to get the assent of Mr. Snow to these proceedings? Suppose Mr. Snow had refused, would Mr. Holliday have been compelled to resort to legal proceedings against the vendees, when both he and Wilson were satisfied that it would be better to take the property and sell it in discharge of the mortgage? I think not. There seems to be no claim that Holliday and Wilson did not act in good faith, and, having done so, I think the decree

should be affirmed. In all other respects I concur in the conclusion reached by my Brother HOOKER.

LONG, J., did not sit.